**KEVIN T. SINGER,**

    **Plaintiff,**

    v.                                                                               **Case No. 19-CV-004**

**DR. SCHETTLE and
JASON JACKSON,**

    **Defendants.**

## DECISION AND ORDER

Plaintiff Kevin T. Singer, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983 in the United States District Court for the Western District of Wisconsin. District Judge James Peterson screened the complaint and allowed Singer to proceed on Eighth Amendment claims against the defendants. (ECF No. 6.) The case was transferred to this court and assigned to Magistrate Judge David Jones. (ECF No. 15.) The case was later reassigned to this court after Judge Jones resigned. All parties consented to this court's jurisdiction. (ECF Nos. 37, 39.)

The defendants now move for summary judgment. (ECF No. 42.) Singer opposes the motion (ECF No. 56) and requests the appointment of counsel (ECF No. 59). The motion is fully briefed and ready for resolution.

## BACKGROUND

The facts in this section are taken from the defendants' proposed findings of fact (ECF No. 44) and their declarations in support (ECF Nos. 45–48). Singer responded to the defendants' proposed findings of fact. (ECF No. 57.) Singer disputes several of the defendants' proposed facts but rarely cites evidence to support his disputes. The only evidence he submitted in support of his opposition to the defendants' motion is a two-page affidavit. (ECF No. 58.) Except where Singer contests the defendants' proposed facts with a statement in his affidavit, the court will deem the proposed fact admitted. *See* Fed. R. Civ. P. 56(c)(1); Civil L. R. 56(b)(1)(C)(i), (b)(2)(B)(i)–(ii), and (b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.").

### A. The Parties

At all times relevant to this lawsuit Singer was an inmate at Waupun Correctional Institution ("WCI"). (ECF No. 44, ¶ 1.) The court allowed him to proceed on claims against Dr. John Schettle, a now retired dentist previously employed with the Wisconsin Department of Corrections, and Jason Jackson, a dental assistant. (*Id.*, ¶¶ 2, 4.) Dr. Schettle and Jackson both worked at WCI during all relevant times. (*Id.*, ¶¶ 3–4.) As a dental assistant Jackson provided chairside assistance and office support services in the Dental Services Unit. (*Id.*, ¶ 5.)

### B. Dental Care Procedures at WCI

Inmates at all Wisconsin Department of Corrections institutions receive a handbook when they enter the prison instructing them to request medical or dental attention by filing a request with the Health Services Unit. (ECF No. 44, ¶ 6.) Dental Service Requests may be either emergency, urgent, routine, or hygiene in nature. (*Id.*, ¶¶ 7–12.) Dentists must triage Dental Service Requests, identify the proper category based on the request, and then provide the request to dental assistants for placement on the waiting list for that category. (*Id.*, ¶¶ 13–14.) Dental assistants do not triage the service requests. (*Id.*, ¶ 15.)

All inmates are required to pay a copay for health services, including dental services and treatment. (ECF No. 44, ¶ 20.) The Wisconsin Department of Corrections offers several payment plans to address the copay. (*Id.*, ¶ 21.)

### C. Singer's Dental Care at WCI

Singer's claims relate to four dental appointments in 2017 during which the defendants provided him treatment: May 8, June 1, June 9, and June 12. (ECF No. 44, ¶ 16.)

#### 1. *May 8, 2017 Appointment*

On May 8, 2017, Singer appeared for a routine treatment of a filling on tooth #15. (ECF No. 44, ¶ 17.) Singer had a failing stainless steel crown on that tooth, and Dr. Schettle determined it was best to either repair the crown with a filling or replace the crown and remove any decay around it. (*Id.*, ¶¶ 17, 19) Dr. Schettle informed Singer of the treatment plan but did not discuss extracting the tooth. (*Id.*,

3

¶ 19.) During the appointment Singer complained about having to pay a $7.50 copay for the routine treatment and ultimately refused treatment because he did not have funds to pay the copay. (*Id.*, ¶ 18.) Dr. Schettle explained to Singer that his condition would worsen if he refused treatment and advised him to pay the copay and receive the treatment. (*Id.*) Singer still refused treatment and signed the refusal form in front of Dr. Schettle. (*Id.*)

The defendants state that Singer expressed no desire to harm himself during the May 8, 2017 appointment and did not state that he would extract the tooth himself. (ECF No. 44, ¶ 22.) On the refusal from Singer listed only "lack of funds" as the reason he was refusing dental care. (ECF No. 45-1 at 10.) During his deposition Singer stated that Dr. Schettle "tried to talk [him] out of" performing his own dental work or extracting his own tooth. (ECF No. 46-2 at 7.)

On May 24, 2017, the dental unit received a Dental Service Request from Singer that stated, "My tooth is starting to ache painfully." (ECF No. 44, ¶ 23 (citing ECF No. 45-1 at 8).) Dr. Schettle responded the next day and directed that Singer be placed on the "essential" wait list for evaluation. (*Id.*, ¶ 24.) On May 30, 2017, Singer had a visit with Psychological Services clinician Desiree Grin, who he told that he had removed his tooth and flushed it down the toilet. (*Id.*, ¶ 25.) Grin completed an incident report that did not classify Singer's act "as self-harm clinically," but she did note her concern about Singer's "high propensity to engage in self-harm." (*Id.*, ¶¶ 25–26; ECF No. 47-1 at 2.) Singer states that he also told Grin he was considering suing "the dentist," and Grin "seemed supportive of the idea." (ECF No. 58, ¶ 1.) He stated

4

in his deposition that he, in fact, kept the tooth and flushed the razorblade down the toilet. (ECF No. 46-2 at 9.)

### 2. *June 1, 2017 Appointment*

Although Singer had told Grin that he had removed his tooth, the defendants state that he appeared for a dental appointment on June 1, 2017, to address the crown on tooth #15. (ECF No. 44, ¶ 27.) Dr. Schettle was with another patient at the time, and Singer did not wait for treatment, returning to his housing unit. (*Id.*) When Dr. Schettle was available he asked Jackson to call Singer back for his evaluation. (*Id.*) When he returned for the appointment Singer again complained about the copay and maintained that he would refuse treatment to avoid paying it. (*Id.*, ¶ 28.) Dr. Schettle told Singer that he could accept the treatment and "go negative in his account" to pay for it. (*Id.*) Singer responded that he had the money but wished to use it to pay for items from the canteen instead. (*Id.*) Singer admitted at his deposition that he had sufficient funds to pay the copay and, as the defendants assert, spent the money instead on canteen items. (*Id.*, ¶¶ 30–31 (citing ECF No. 46-2 at 3, 5).) Singer also testified that Dr. Schettle did not treat or examine his mouth during the June 1, 2017 appointment because Singer refused to pay the copay. (ECF No. 46-2 at 4.) Singer signed another refusal form and wrote, "Because of copay, I'll do my own dental work." (ECF No. 44, ¶ 29; ECF No. 45-1 at 6.) Dr. Schettle asserts that he did not believe that Singer's statement on the refusal form suggested that Singer was planning to extract his own tooth or harm himself. (ECF No. 44, ¶ 32.)

5

### 3. June 9, 2017 Appointment

On June 9 the Dental Services Unit received a request for treatment from Singer that stated,

> The toothe [sic] I pulled a couple of weeks ago started to hurt this morning so I probed the back of my mouth and learned that a fragment is still in my mouth. That's bad so I'll do everything I can to get it out. I still won't pay $7.50.

(ECF No. 44, ¶ 33 (quoting ECF No. 45-1 at 9).) Dr. Schettle responded and booked Singer for an urgent appointment. (*Id.*) Singer appeared that afternoon for his evaluation, and Dr. Schettle examined Singer's mouth and took x-rays. (*Id.*, ¶ 34.) Dr. Schettle observed a loosening of the crown, significant decay of the tooth, and trauma around Singer's gumline. (*Id.*) Singer avers that Dr. Schettle told him that the inside of his mouth "looked like hamburger meat." (ECF No. 58, ¶ 3.) He asserts that his tooth "was broken in half and the inside of my mouth was all cut up." (*Id.*, ¶ 2.) Dr. Schettle states that Singer told him he "pulled most of his tooth and that some of it remained," but Dr. Schettle observed that Singer's entire tooth remained and only the crown had been loosened. (ECF No. 44, ¶ 35.)

Dr. Schettle concluded that Singer's tooth was not salvageable and required extraction. (ECF No. 44, ¶¶ 34, 36.) Singer still refused to pay a copay and stated "that he would use a razor to remove the remaining portion of tooth," as he had prior to the June 9, 2017 appointment. (*Id.*, ¶ 36.) Singer again signed a refusal form, on which he wrote "I have to do my own dental work because I can't afford the copay." (*Id.*, ¶ 37; ECF No. 45-1 at 7.) He refused any further treatment by Dr. Schettle that

6

required paying a copay. (ECF No. 44, ¶ 38.) Singer testified at his deposition that he attempted to cut out his tooth because he was angry about the copay fee and "[b]ecause I said I would, so I was carrying out, you know, my stated intent." (ECF No. 46-2 at 9.)

After the appointment Dr. Schettle notified the Psychological Services Unit about Singer's attempt to remove his own tooth, even though he did not consider Singer's act one of intentional self-harm. (ECF No. 44, ¶ 39.) Dr. Schettle called several numbers for the Psychological Services Unit but received no answer. (*Id.*, ¶ 40.) He was able to reach a security officer at the unit and informed the officer of Singer's attempt to remove his own tooth and his statement that he would try it again. (*Id.*) Dr. Schettle asked the security officer to relay the message to staff at the Psychological Services Unit, as is common for officers to do. (*Id.*) Dr. Schettle also attempted to write an incident report with a nurse clinician (who is not a defendant), but the nurse was unfamiliar with the electronic system for uploading incident reports and unsuccessful in uploading a report. (*Id.*, ¶ 41.) Dr. Schettle documented his attempts to contact the Psychological Services Unit and write the incident report in Singer's treatment notes. (ECF No. 45-1 at 3.)

The nurse contacted WCI Warden Brian Foster (who is not a defendant) and told him about Singer's statement that he would remove his own tooth. (ECF No. 44, ¶ 42.) Later that day Dr. Schettle also called the Warden and requested his approval to waive the copay and extract Singer's tooth. (*Id.*, 44, ¶ 43.) The Warden verbally approved the plan and later emailed his approval of treatment without the copay.

7

(*Id.*; ECF No. 45-1 at 11.) Because Dr. Schettle received the Warden's approval to waive the copay late in the day and on a Friday he scheduled an appointment with Singer for Monday, June 12, 2017. (ECF No. 44, ¶ 45.)

### 4. June 12, 2017 Appointment

At the June 12, 2017 appointment, Singer appeared and consented to treatment without being required to pay the copay, and Dr. Schettle removed tooth #15. (ECF No. 44, ¶ 46; ECF No. 45-1 at 12.) Dr. Schettle had no further interaction with Singer and no further involvement in his dental care. (ECF No. 44, at ¶ 49.) He maintains that he does not believe that Singer attempted to remove his own tooth as an act of self-harm but instead as an act of anger at having to pay the copay. (*Id.*, ¶ 50.)

Jackson asserts that, like Dr. Schettle, he does not recall Singer suggesting he was going to harm himself or perform his own dental work as an act of self-harm. (ECF No. 44, ¶ 54.) He deferred to Dr. Schettle's medical judgment on treatment decisions and on how to address Singer's issues. (*Id.*, ¶ 55.)

**D. Singer's Complaint and Affidavit**

Because Singer's complaint is verified, the court will treat it as "the equivalent of an affidavit" for purposes of this decision. *See Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013); *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996). Singer states in his complaint that he told Dr. Schettle and Jackson during the May 8, 2017 appointment that he would "cut the tooth out myself with a razorblade and do my own dental work." (ECF No. 1, ¶ 13.) He states that he told them the same at the

8

June 1, 2017 appointment. (*Id.*, ¶ 14.) Singer asserts that by the June 9, 2017 appointment he had attempted to remove his tooth, but part of it remained in his mouth. (*Id.*, ¶ 15.) Singer states that he was called to the Health Services Unit (not the Dental Services Unit) on June 11, 2017, "to stop the bleeding in my mouth." (*Id.*, ¶ 16.) He states that on June 12, 2017, Dr. Schettle waived the copay and extracted "the remainder of my tooth which remained in my mouth." (*Id.*, ¶ 17.)

In his affidavit submitted with his summary judgment materials Singer swears that on two occasions he informed Dr. Schettle, "I will do my own dental work." (ECF No. 58, ¶¶ 2, 5.) Singer does not provide the specific dates on which he told Dr. Schettle this but asserts it was after his May 30, 2017 visit with his therapist. (*Id.*, ¶ 1.) He acknowledges that his comments were documented in his signed forms refusing medical treatment and states that he "was more specific in person telling the dentist that I would cut out my own tooth with a razorblade." (*Id.* at ¶ 5.) Singer states that, despite telling Dr. Schettle and Jackson that he would cut out his own tooth with a razorblade, neither defendant did anything to prevent him from harming himself even after observing the scarring in his mouth from his attempt to remove his own tooth. (*Id.*, ¶¶ 2, 4.)

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*,

477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## ANALYSIS

The Eighth Amendment prohibits cruel and unusual punishments. *See generally Wilson v. Seiter*, 501 U.S. 294 (1991). To state a valid Eighth Amendment claim, the inmate must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. A prison official cannot be found liable under the Eighth Amendment unless she subjectively knows of an excessive risk of harm to an inmate's health or safety and disregards that risk. *Id.* at 837; *Perez*, 792 F.3d at 776. Neither negligence nor medical malpractice is enough to support an Eighth Amendment claim. *See Farmer*, 511 U.S. at 835–36; *Estelle*, 429 U.S. at 106; *Brown v. Peters*, 940 F.3d 932, 937 (7th Cir. 2019).

10

Prison officials have a duty to intervene to protect an inmate from acts of self-harm. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) (citing *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012)). The United States Court of Appeals for the Seventh Circuit has stated that acts of self-harm constitute "a serious harm" that satisfies the objective component of an Eighth Amendment claim. *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012) (citing cases); *see Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

To satisfy the subjective component of an Eighth Amendment claim Singer must show that the defendants knew he "was at substantial risk" of harming himself and "intentionally disregarded the risk." *Collins*, 462 F.3d at 761. For a prison official to be liable for ignoring a risk of self-harm the "risk of future harm must be sure or very likely to give rise to sufficiently imminent dangers." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) (internal quotation marks omitted). It is not enough to show that "a prison official *should have been* aware" of the risk; the defendant "'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Collins*, 462 F.3d at 761 (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (emphasis in original)); *Farmer*, 511 U.S. at 837.

### A. Singer's Eighth Amendment Claim

The defendants assert that Singer's claim of deliberate indifference fails because his act of performing his own dental work was not intended as self-harm but as a protest of the $7.50 copay that he refused to pay. (ECF No. 43 at 11–11.) They

11

contend that his threat to perform his own dental work was not sufficiently serious to constitute an Eighth Amendment violation because his "clear motivation" was to obtain dental work for free. (*Id.* at 12–13.) The defendants further contend that, even if the risk to Singer's health or safety were sufficiently serious, he cannot show that either defendant subjectively inferred and disregarded that risk. (*Id.* at 16–18.)

Singer's motivation in performing his own dental work is irrelevant to determining whether the potential harm to himself was objectively serious. Nor is it relevant that Singer did not characterize his own dental work as self-harm. What matters is whether the risk to his health or safety is objectively serious. It is undisputed that Singer's self-performed dental work resulted in, at a minimum, the loosening of his crown and trauma to his gumline. The risk that Singer would cause significant harm to himself by performing his own dental work with a razorblade was objectively serious.

There also are genuine disputes of material fact about what Singer told the defendants and when. Singer's evidence is thin, but he states in his verified complaint that he told Dr. Schettle and Jackson during the May 8 and June 1, 2017 appointments that he would "cut the tooth out myself with a razorblade and do my own dental work." In his affidavit Singer does not discuss the May 8, 2017 appointment but states that by May 30, 2017, he had already attempted to remove his tooth. He states that he told the defendants twice after that date (presumably at the June 1 and 9, 2017 appointments) that he "would cut out my own tooth with a razor blade," and they did nothing to prevent him from doing that. Singer asserts

12

that, even after Dr. Schettle observed the aftermath of Singer's attempted extraction (presumably at the June 9, 2017 appointment), the defendants did nothing to prevent Singer from further harming himself.

The defendants state that Singer never specifically said he was going to cut out his own tooth with a razorblade. According to them, he refused to pay the copay at the May 8, 2017 appointment but did not suggest he would perform his own dental work or harm himself. It was not until the June 1, 2017 appointment that Singer first said he would perform his own dental work. Even then, the defendants insist he did not suggest he was going to attempt to cut out his own tooth. Nor did they interpret his comments to suggest he would harm himself or attempt to extract his own tooth. The defendants state it was not until the June 9, 2017 appointment, when Singer presented with trauma and scarring in his mouth, that Dr. Schettle first inferred that Singer was a threat to himself. It was after that appointment that Dr. Schettle called the Psychological Services Unit and the Warden to report Singer's actions and seek emergency treatment.

The differences in stories—specifically, what Singer said to the defendants and when—precludes the entry of summary judgment for the defendants. If Singer told Dr. Schettle and Jackson as early as May 8, 2017, that he was going to cut out his tooth with a razorblade, a jury could conclude that the defendants should have acted earlier to prevent Singer from harming himself. But if, as the defendants assert, Singer did not suggest he would cut out his tooth until the June 9, 2017 appointment, when he already had attempted to remove his tooth, no jury could conclude that the

13

defendants acted unreasonably in not seeking outside help until after that appointment. Summary judgment is not the appropriate place to determine which party's story is more credible. *See Ayoubi v. Dart*, 729 F. App'x 455, 458 (7th Cir. 2018) (quoting *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003)) ("It is the job of the jury, and not the district court judge at summary judgment, to determine which party's evidence to credit.").

## B. Qualified Immunity

The defendants assert that they are entitled to qualified immunity on Singer's claim. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted).

Qualified immunity is an affirmative defense. Once raised, the plaintiff must show that the defendants violated his constitutional right and that the right at issue was clearly established at the time of the violation. *Pearson*, 555 U.S. at 232. The law is "clearly established" only if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Figgs*, 829 F.3d at 905 (quoting *Campbell v. Peters*, 256 F.3d 695, 701 (7th Cir. 2001)) (internal quotation marks omitted). "The clearly established law must be 'particularized" to the facts of the case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is

14

not necessary that there be cases "directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (internal quotation marks omitted).

The law establishing the defendants' potentially wrongful acts was clearly established in May and June 2017, as discussed in *Estate of Miller*, 680 F.3d at 989; *Collins*, 462 F.3d at 760; and the cases cited in those decisions. As discussed, the evidence establishes that Singer faced an objectively serious risk of harm, and there is a genuine dispute of fact as to whether the defendants were aware of that risk and ignored it. If Singer told the defendants on May 8 or June 1, 2017, that he would cut out his tooth with a razorblade, then they may be liable for failing to act to protect him from that imminent risk of self-harm. The defendants are not entitled to qualified immunity on Singer's Eighth Amendment claim.

### C. Motion for Appointment of Counsel

Singer moves for the appointment of counsel. (ECF No. 59.) In a civil case, the court has the discretion to recruit counsel for individuals unable to afford counsel. *Navejar v. Iyola*, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866–67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" *Henderson v. Ghosh*, 755 F.3d 559, 564 (7th Cir. 2014) (quoting *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" *Pennewell v. Parish et al.,* 923 F.3d 486, 490 (7th Cir. 2019) (quoting *Pruitt v. Mote,* 503 F.3d 647, 653 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. *Pickett v. Chicago Transit Authority,* 930 F.3d 869, 871 (7th Cir. 2019). To demonstrate a good faith effort, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyers; and (4) the lawyers' responses.

When considering the second element, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." *Pennewell,* 923 F.3d at 490. The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." *Id.* This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." *Id.* at 490–491. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." *Id.* at 491. In situations where the plaintiff files his motion in the

16

early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." *Pickett*, 930 F.3d at 871.

Singer states he sent letters to ten law firms seeking an attorney to represent him. (ECF No. 59, ¶ 1.) He received rejection letters from some, others were returned to him, and some were not answered at all. (*Id.*) Singer has not attached any of the returned letters. He states that he has a learning disability and short-term memory loss that make it difficult for him to work on his case. (*Id.*, ¶ 4) He also states that he spends much of his time in observation, where it is often impossible for him to perform legal research. (*Id.*, ¶ 2.)

Although Singer satisfies the first element for recruiting counsel, he does not satisfy the second element. This is not a difficult case, factually or legally. The outcome, if it goes to trial, will rest on the testimony of Singer and the defendants. It is a simple matter of what Singer told the doctors and when, as noted in this decision. Moreover, Singer's pleadings, particularly his response to the defendants' proposed facts, show that he fully comprehends the material facts and the legal questions at issue. Although Singer testified that he has issues with his short-term memory, he has had no issues to date recalling and describing the important events in this case. His deposition also showed that he recalls the events from 2017 and can describe those events clearly and articulately.

The court will therefore **DENY** Singer's motion to recruit counsel. The court will schedule a status conference with the parties to address the next steps in this case.

17

## CONCLUSION

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 42) is **DENIED**.

**IT IS FURTHER ORDERED** Singer's motion for appointment of counsel (ECF No. 59) is **DENIED**. The court will schedule a telephone status conference with the parties in a separate order.

Dated at Milwaukee, Wisconsin this 29th day of June, 2020.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge